Justice O'Malley had a knee operation and is recovering and won't be able, or isn't here today, and he asked to express his apologies for not being able to come. We're on this fourth case of the morning call, 209-1283, Helping Others Maintain Environmental Standards in the Illinois Nonprofit Corporation at Baldwin v. A.J. Boss, Tradition Investments, LLC, and the Illinois Department of Agriculture. On behalf of the M.R.A., Mr. David Albee, on behalf of the Illinois Department of Agriculture, Mr. Brett Leitner, and on behalf of the M.R.A., A.J. Boss, Mr. Donald P. Manning. Has the Attorney General and the defendant decided on how they're going to split their time? We have, Your Honor. I've done many for A.J. Boss, but we're going to need to re-disclose approximately eight minutes each. All right. You may proceed. Good morning. My name is David Albee. I'm the attorney for the plaintiffs. This case started two or three years ago when the plaintiffs came home one day to find a certified letter in the mailbox. Let me interrupt. I have my notebook up here, and apparently the clerk might have taken it. I need that notebook. Because of the numerous legal issues in the case, we'll probably give you more time than the usual 15 minutes for purposes of argument. So if you need additional time, just request it. You may continue. Sure. The plaintiffs came home one day to find the certified letter in the mailbox. And they signed for the letter, opened the letter, and the letter is from the Department of Agriculture. And it contained a notice of intent to construct. The plaintiffs live in the vicinity of the proposed operation, and they're quite familiar with agricultural operations. And then after reading it and seeing that the proposal calls for 5,500 cows on one side of the street and 5,500 cows on the other side of the street, their imagination and knowledge automatically was... If I were you, I would get to the facts and the particular legal issues because your time is going to be... They went to the public information committee. And it's not so much a public information committee as it is that this is how it's going to be. Their rights at that point were either nonexistent or somehow limited by the LMFA such that they didn't have anything to say about it. This deal was going through. They could ask questions, but they had no input as to whether or not it would actually... if they had anything to say that they could possibly stop it at that time. What are the rights of standing under the Livestock Act? What are they? There is a provision in the regulations for administrative review, I believe, for petitioning for reconsideration, but it doesn't specifically specify that a neighbor can petition for administrative review or ask for a register of charge. It's silent as to who has standing. But certainly by necessary implication, if the purpose of the Livestock Act is to be a good neighbor, then neighbors must have standing. What about the issue, were there parties in the proceeding before the department? Does that present a problem? Isn't that one of the issues of whether or not they were upstanding because they didn't participate in the deal? That's what they've raised, that they're not a formal plaintiff or defendant or respondent or petitioner, that they're claiming that the only parties in the strict sense are the Department of Agriculture and the applicant. But again, this is the LMFA, and if the purpose of the act is to be a good neighbor, the neighbors whose interests are directly affected by this proposal certainly have to have – they can't be shut out of this proceeding. They are the ones that will be affected the most. So it must be construed to give them standing to assert an objection. So you're almost saying there's some kind of implied standing. You're not arguing that the Livestock Act itself gives them status as parties of record, does it? No. Okay. No, I'm not. But certainly, again, if the purpose of the act is to – it's twofold. According to Nichols and Burnett, the case was to promote agriculture while at the same time making sure that the livestock facility is a good neighbor. So the neighbors, we can't just dismiss them off and say, well, like at the public informational meeting, we'll give you the information. This is how it's going to be. So we went from there, and we filed a complaint, and we sought the injunction. And during the course of seeking the injunction, the plaintiffs were slapped by the letter from the counsel. It's found in the record. It's C-701, a letter from the Megaderry's lawyer saying that no matter what the outcome of this, we intend to sue you for our costs and damages. Because we say that this case is frivolous, and there is nothing frivolous about this case at all. Which obviously upset the homeowners because they're saying, hey, well, you know, we're concerned about contaminants from the livestock, getting into the aquifer, polluting the wells that we have. And lo and behold, they find this letter and it comes out. But getting back to some legal issues, generally speaking, the parties seeking review of the agency's decision should be a part of the record. If the finding is against you on that issue, what about an applied right of the homeowners, a private right of the homeowners? We certainly have asserted that right. We filed a petition for reconsideration with the Department of Agriculture, and they responded by saying, sorry, you don't have standing to even do that. So your position is, A, you have standing, although there's some case law that might make that argument problematic. But you're saying, notwithstanding that, you're going to hang your head on sort of a private right that's implied under the Livestock Act. Absolutely, yes, sir. Okay. And it must be implied to effectuate the purpose of the act. The purpose of the act is to be a good neighbor. Therefore, neighbors have something to say about it. They can't be shut out. They have to be heard. They will be impacted the most by a facility of this magnitude. We're not talking about just some 200 cows or somebody raising goats in their backyard. This is a full-scale industrial facility manufacturing it on a grand scale. Are you relying on any particular case that would give you implied standing? There are several. There is the recent case that we cited, which was citizens opposing pollution. The Greer case gives us standing. GLSEN certainly gives us standing to assert our constitutional right to a healthful environment, which is the crux of our case. In the GLSEN case, they held that the plaintiff didn't have standing because the Endangered Species Act only pertained to endangered species and not human health. This case directly affects human health. Therefore, plaintiffs have standing. Their interests are directly affected by this. They must be allowed to assert their objections to this facility. Let's assume for the moment you get over the standing hurdle. It is a hurdle, admittedly. Let's look at the merits of the case. You're confronted with the facts. The trial court originally had granted the preliminary injunction. Obviously, after hearing, as I read the record, extending over a couple of weeks, the trial court decided not to grant the permanent injunction. The court heard all the evidence. There were experts on both sides of the issue, as I understand it. Plaintiffs, homeowners had their experts. The megadairy had their experts. And in the end, the court, after weighing the evidence, decided not to grant the injunction. Why was that erroneous? Why was that against the manifest weight of the evidence? That's really the issue before the court. We've relied in great part on the Wilsonville case. In Wilsonville, the trial court did grant the injunction. And it was upheld by the appellate court and the Supreme Court. But the result in the Wilsonville case was to prevent a certain environmental catastrophe from occurring. Here, the judgment of the trial court will allow a certain and horrific environmental catastrophe to occur. No reasonable-minded person would disagree that when these waste ponds leak and contaminate the aquifer, which is under the entire region. Wasn't that all a disputed fact, whether the type of underground condition, the location of the ponds, whether the ponds could have an underlining of clay? Weren't those all disputed facts that the court heard? Yes, there were disputed facts. The court heard them. And the court recognized that the gist of our claims was that since this area is a karst area, and the ponds are there, the LMFA requires anything in a karst area to be constructed a waste facility. What's your definition of a karst area, a karst region, and a karst site? Karst area, there is none. Geologically speaking, there is none. The geological concept of karst is a regional concept which extends from the Mississippi River all the way to Freeport. And when the legislature enacted the LMFA, they had that in mind, that a karst area is an area wherein additional safety precautions have to be taken. And you can't just drill a three-inch tube into some portion of this facility and say, therefore, it's going to be safe. So karst, for a layperson's definition, so I understand it, would it be fair to say karst refers to a region made up of porous limestone? Is that sort of a general definition? Certainly, to my mind, it is. But it's also characterized by the ability for surface water to rapidly enter the aquifer and travel fast. Whereas, in a non-karst region, surface and groundwater is fairly stagnant. It takes a long time to travel. So here's the dangerous nature of the region, why we have to take the additional safety precautions. Now, the appellant's primary witnesses were Pano, and if I pronounce the name correctly, Hiddle? Hiddle. And didn't the judge make a finding that the problem with their testimony was most of it was off-site testimony consisting of photographs, some minor on-site testing, I think a limer test, which indicated some lines that may be important in locating the karst. And in weighing the evidence, it found that the defendant's experts were primarily on-site tests, and the tests were more expansive and explicit and revealed more than the appellant's tests. One could argue that that went through the trial judge's mind. However, the regional concept of karst cannot be decided by a specific on-site drilling of a three-inch diameter tube. And the witnesses, the expert witnesses for the mega-dairy were paid expert witnesses. The witnesses for the plaintiffs were state employees. We asked the Illinois State Geological Survey for their records, property, the public records with respect to this area, and the first thing we got was the map, and it shows all of the counties is mapped as a karst region. That in and of itself should require the additional safety precautions. Well, that's why I asked you what your definition of a karst region is. Can you have a 20-acre parcel on a large map, a county-wide map that doesn't have karst? Can you have an island in the sea of karst? No, we cannot have an island in the sea of karst. And to say that this... Wasn't that a disputed fact? Yes, that was a disputed fact. And it justifies the geological definition of a karst region. Are you saying the trial court should have taken judicial notice or assumed that this area was a karst region automatically? Yes, sir. These are the public records of the state of Illinois. So individual site drillings would be irrelevant to this? There are numerous tests that anyone can do to... It's like trying to find a needle in a haystack. You can do all these tests, but all it takes is one crack or fissure to permit the rapid escape of the contaminants into the aquifer. And it's a regional concept where every road cut in the area, every underpass, overpass, where you look, they noticed karst fissures. And for someone to say that they've done a... The only test they did was they drilled a few holes in the ground and came up and said, See, no karst in this three-inch tube. Did the plaintiff's experts do any core, take any core samples? I didn't see that they did. No, we didn't. We had to rely on the state geological people for our expert... Why couldn't some drillings have been done? Why couldn't some core samples have been taken to help the case? Well, they wouldn't help because my conversation with the state geologists was, Well, does this alter your opinion in any way? Does this hurt? Is it still karst? It's absolutely still karst. It's always been karst. I thought Cano testified in Cross that the most appropriate way to determine the suitability of the site for the proposed use required site-specific analysis, which he didn't do. He was on the site. So was Dr. Hiddle. And they observed and they said there's no need to do any testing. There's nothing that would change their earlier opinion. What about a dye-tracing test for determining the presence of karst? Isn't it considered... That's an additional test that can be taken. It's pretty much a valid, recognized test, right? To my understanding, it is, yes, sir. Why wasn't that done? Lack of funds. The state doesn't have any in the state. It's in a budget crisis. And dye-tracing takes years. It's not something you can just go on site and force them to dye and look for it downstream. Which brings me back to streams. There are streams through the site, and the perimeter drainage system for this megadairy is designed to drain into the stream that flows into the Apple River. It's in a bad location, and it's poorly designed at best. There's something everybody, I think, here should understand, and that's the legal issues. As you know, as an attorney, perhaps you've had this discussion. When a case comes up on appeal in this case, ultimately the issue is whether or not a trial court's ruling having weighed all the evidence was against the manifest weight of the evidence. That's the perspective of the test that we look at. In other words, was an apposite conclusion clearly apparent? We don't hear the case, as you know, de novo, in which we can decide it from the beginning, in other words, and decide what our judgment should be. There is a certain deference given to the trial court. We would have to decide the trial court's ruling was against the manifest weight of the evidence to overturn this. Obviously, there is legitimate concern from the homeowners, because if someone is wrong, the potential for devastation is great. But we have to look to the evidence here. So tell us why the trial court's ruling was against the manifest weight of the evidence. That's really the ultimate burden that you have here. He did not consider any of the statutory and regulatory violations as relevant to the case. He made no finding as to whether or not this particular facility is located in a karst area. If he had said and ruled that this is a karst area, then the manure waste holding ponds must be constructed out of concrete and steel. Wasn't that a disputed fact also? Whether or not it's a karst area. Whether or not the holding ponds could be other than steel or iron or metal and could be clay. I'm sorry. Even if it isn't a karst area or even if it is a karst area? No, I believe the regulation is straightforward on that point. It says no waste handling facility in a karst or any waste handling facility in a karst area must be constructed out of a rich material such as concrete or steel. And no new livestock facility shall contain within its boundaries any stream. This one does. Those streams go right into the Apple River. It's designed like a big toilet. And it's going to flush downstream. That's the effect this facility will have on the environment. Now, when you use the word karst area, are you talking specifically about the parameters of the farm? No. The karst area is shown on the map. The same as karst region, according to you. Yes, I believe that was the intent of the legislature when they enacted it. They looked at safety precautions, how to protect the health, welfare, and safety of people. And they recognized that anything built in a karst area, you need to be safety first. Well, the department obviously authorized the building of it. Before the site examination was completed. But in terms of the injunction, I'm sure the other side is probably going to give you this sort of an argument. The plaintiffs, you would agree, have the burden of proving the case. Certainly. So what proof was there in the record that the proposed site, not the region, the proposed site, the parameters of this area, sits in a karst area? What evidence? We have the testimony of the Joe Davies County Soil and Water Conservation District Soil Classifier, Lester Johnson. So there's 100% certainty that there's a karst aquifer under that that serves the area's wells. We have the testimony of our expert soil scientist, Dr. Peter Hiddle, who's also qualified as a geologist, who testified that this is a karst region. And he also testified about how he would design a liner for use in this environment. We have the testimony and the public records of the Illinois State Geological Survey. That's our evidence. And there was contrary evidence from the farms expert and the dairies expert. There were paid expert witnesses from the Wisconsin Dairy Board. The law firm up in Wisconsin got those witnesses. I assume there's a lot of issues in Wisconsin that they have the inventory of experts for use in these agriculture cases and they brought them here. The judge chose to give them greater, how did he put it, greater weight and quality, but still made no specific findings of fact. It's just a general, well, I think the weight and quality of their experts is such that plaintiffs lose. All right, so you're saying, in essence, the trial court did not delineate the specific reasons why he chose defendants experts over yours. Is that sort of a fair statement? That's right. Do you know of any case law that requires the trial court to make specific findings of fact of a case like this? Not offhand, but there are cases, I know that are out there, that trial judges, that the plaintiffs and litigants in the case have the right to have a trial judge make specific findings of fact on certain issues. I mean, I can't give you the citation at the moment. Certainly, a judge just can't say you win and you lose, and certainly in a case like this, he should have made a detailed finding. Well, this was a permanent injunction case. Yes, sir. And do you know of any permanent injunction law that requires the court to make specific findings of it relative to its ruling? No, but it certainly would stand to reason that this would be that an injunction has to be specific and definite, and therefore, it would necessarily require a judge to specify what was to be enjoined and how it was to be enjoined, if it was to be enjoined, and would require factual findings. So your lawsuit was to enjoin the defendant from building anything on the property. Operating as designed. Operating a mega-farm. As designed. Operating as designed. As designed. So, designing it in a karst area with inadequate waste container. I believe that was one of the findings of the trial court, that the gist of our claims is that because the waste ponds are underling by karst, therefore, the waste content is clay liner. Essentially, what they're doing is digging a hole in the ground. 30 acres, 20 feet deep. And then they take dirt and they pack it around and they compact it to achieve a coefficient of permeability. I think it's 10 to the minus 7th, which is a rate of flow. And then they claim that, well, the dirt underneath it also is relatively impermeable. Why bother building a liner in the first place if you don't need to? But you had a number of experts that testified that the coefficient was met. And that would allow the leakage, according to one of their experts, engineers, of, was it $1,000 gallons per acre per day, the preliminary injunction foreseeing. And at trial, their expert admitted that the pond would leak in the northwest corner where the depth of bedrock was only, I think it was three feet. That it would leak up in that corner by, forget how many gallons per acre per day, the rate of leakage. So it's going to leak. They've admitted it's going to leak. The public nuisance statute defines contamination of groundwater to be a public nuisance. So there's evidence that they've admitted to that this is going to leak into the groundwater. That, by definition, is a public nuisance. Toxic silage, Leachate, has, is, and will continue to flow from the site and across the street on Mr. Holsinger's property. He lives within the setback distances. They deliberately shorted him that they've miscalculated these setbacks to squeeze this facility in. Perhaps there's an argument about how to calculate the setbacks. We certainly argue safety first. And that requires that persons who live in this area and their health and welfare is paramount. Again, no finding of fact with respect to whether or not the setback was violated. They testified that there's a perimeter drain system that goes right into the stream. So that when the liquid, what's, the poop, when it goes through the liner and into the groundwater, it'll enter the perimeter, some will enter the perimeter drain system and go straight down the Apple River. Wasn't there some further evidence that apparently the, that the tile drains that were on the border of the property were relocated and the problem of tile drain leaking into the site itself was eliminated? No, still there. It's designed to catch. It's supposed to alleviate pressure on one side of the berm with the other side of the berm. But it does nothing for the groundwater, which is naturally up high. So we essentially have a groundwater soup and it's going to leak into this groundwater soup. Some will enter the drain system and flow down the river. All right. Your time is up and I think what we'll do now is hear from the appellees and then we'll be able to respond. Thank you. Good afternoon. Good afternoon. May it please the Court, my name is Don Manning. I'm from Rockford, Illinois, from the law firm of McGreevy Williams. I represent A.J. Boss and Tradition Investments. I have a very brief presentation, but before I get to that, I want to address a couple of the things that Your Honors asked Mr. Alvey about. The first relates to the question of what is a karst region versus a karst area, and I think karst site was a third phrase that was mentioned. What's important from our point of view here is that the statute itself, the LMFA, uses an Illinois Geological Survey map, it's called ISGS Map 8, as the basic tool to identify the type of analysis that should go into whether the site is karstic or not, whether it is a karst area. And Illinois GS Map 8 literally is entitled sinkholes of Illinois, sinkhole areas of Illinois. There's another map, there's a factual dispute about who authored it, but there's another map attributed to the ISGS that's called karst areas of Illinois that is identical in substance to ISGS Map 8. On that map, the property where this dairy is located is not in a karst area. Therefore, under the statute, there's a testing protocol that is utilized to determine whether, in fact, there is karstified carbon bedrock below the containment areas. And the statute and regulations are fairly technical when it gets to that point. However, the basic result of the construction of the statute and the regulations is that there is a protocol of testing that's utilized to determine whether or not there's evidence of karstified carbon bedrock. That was done here. There were something like 20 soil borings, 5 rock corings, there were angled rock corings. On the site itself, not the region, on the proposed site of the mega-dip. Under the ponds. Right. I would suggest to Your Honor that the question of what is a karst area under the statute and the regulations is a question of what is actually under the ponds themselves. Not even the general farm. It's the containments that we're talking about. And these tests were done on that specific part of the property with, in our view, no evidence of karstified carbon bedrock. No evidence was ascertained of a karstified carbon bedrock? That's correct. I mean, you can understand the concerns of the plaintiffs and the homeowners. I mean, Ms. Relman makes a very good case. I mean, if in fact that was not to be true, the potential consequences would be catastrophic. I would suggest to Your Honor that that is true with most anything we build or develop these days. But the Illinois Department of Agriculture is vested with the authority and has the expertise. They have geologists on staff that looked at all of this. They went out to the site. There were multiple tests, corings, borings. There were probes. The bedrock was exposed. The agency in its expertise has made the determination that it is more likely than not that the construction will meet the standards and it should go forward. So I understand that people have concerns. And that's why the process exists. It's not as though my client were in a regulatory-free environment where he just went out there, dug ponds and started to operate, which, by the way, was the state of the law before the statute was enacted. All right, to put this in the context of the case, plaintiff's attorney raises a legitimate issue. Obviously, they had some evidence, a certain amount of evidence, quantum of evidence. To the contrary, why does the evidence provided by the mega-dairies experts, why should that have been given precedence over the evidence by the plaintiffs? The primary reason is that the evidence that we brought forward through our experts is site-specific evidence, including the initial assessment of the site and then a very detailed assessment by an expert named David Traynor, who's highly regarded in this area, who characterized this site, the geology of the site, and gave his opinion, including the rate at which water might or could move in the existing clays and through the bedrock. And all I can say is that the trial judge heard the evidence. He heard Mr. Traynor. He heard Mr. Pofall. He heard Terry Feldman and the other professionals from Maurer Stutz, our consultant that built the facility, and decided that that was of a greater quality and weight than the evidence. From a technical standpoint, looking at it from the position of the homeowners, why is that evidence you just alluded to superior to the evidence provided by the plaintiff's experts? Primarily because the plaintiff's evidence came through the mouth of Sam Pano, who attempted, without any funding really, attempted to mask the lack of real analysis. And so what happened at trial was, and I think we made this pretty plain on the record, that Mr. Pano was underfunded, had aligned himself with the Holmes Group, and tried to make a generalized characterization, which was not well-founded in science, that because there is karst in the area generally, the court should assume that there's karst here. There was no site-specific evidence that was brought forth by the plaintiff. Wasn't there acidic-worn limestone from a specific site that could indicate it was a karst area? In the driller's logs there were references to a phrase, highly weathered limestone. And we asked Mr. Pano about that on the witness stand, and he denied that the phrase highly weathered limestone is evidence or proof that there's karstified carbonic bedrock. They are not the same. Now, I will say this, that in the plaintiff's rebuttal case, they tried to get another witness named Pius Weibel to testify that highly weathered limestone means karstified carbonic bedrock, but the trial judge properly blocked that for a number of reasons, not the least of which was that that witness, Alpine, indicated on the witness stand that he came to that conclusion the day before he testified while we were well into trial. It was just improper rebuttal testimony. So even though one witness tried to say that for the plaintiffs, the other witness contradicted it. And when we're talking in terms of weighing evidence, I don't think that gets them very far. So in essence, you're saying the test performed by the Megaderry's experts in terms of the state-of-the-art, technologically speaking, was superior to those of the plaintiffs because they did the on-site drilling and inspection? Yes, and as well, the testing protocol complied with the requirements of the statute. They did everything they were required to do under the statute under the supervision of the department. And there was no evidence of karstified carbonic bedrock under the Megaderry's test? None that's been cited to us at all during this proceeding. The next point that I wanted to address is this question about the implied right of action under the LMFA. I think that throughout this litigation, there has been some confusion about how that works. Why does that matter? From our point of view, the question about the review of administrative agency work decisions is not a question about a private right of action. That's a different point. But I think that's been somewhat confused and meshed together throughout the trial court and certainly in some of the briefs here. I think it gets raised in the context that assuming you're correct, if they don't have standing, you could knock their claim out on the standing issue. But would they not have been able to be able to simply proceed on a private right of action under a nuisance theory? Couldn't they still do that if you knocked them out on standing on the appeal? Well, and they had a nuisance case. Now, I think this gets very technical and interesting, but when we talk about how the LMFA might be involved in a public-private nuisance case, in a trespass case, then I think we have to go to the Gilmore highly regulated industry paradigm and ask the question, how, if at all, do the substantive provisions of the LMFA apply in a nuisance case? And the way they might have applied, if the statute were written differently, would be that not on a permitting level, and that's where we are, but on an enforcement level. Let's say this thing is operating and there's something that happens and the plaintiffs want to bring a cause of action and they want to assert a nuisance claim and rely on the statute in asserting it. Well, then you'd have to ask, is it a highly regulated industry? I say it is. I think it's pretty clear that it is. And then the next question is, well, that being the case, how could the statute be involved in their cause of action? They would have to argue that there was somehow a violation of a substantive performance standard in the statute. But the problem with all that is, in an anticipatory nuisance context, it doesn't hold any water. When they're talking about anticipatory nuisance, they can't show that there was a performance violation. What they're trying to do is get at the citing and permitting problem via a private right of action, and I don't think that works. And I think the Fifth District case that just came out that Holmes actually wanted to cite supports what I just said in hindsight as I read it again today. One last important point I'd like to make today is, in our appeal where we were trying to get the judge reversed on his failure to dissolve the injunction, there was a motion filed in this court on the Citizen Participation Act, and I think it's worth discussing just for a minute because I think it's important for precedent in how we operate here. I don't believe, as I stand here today, that a plaintiff can bring a cause of action for public and private nuisance and trespass and do that with complete immunity to the consequences of their actions. So that if you look at the Citizen Participation Act, it anticipates in the preamble that it relates to civil actions for money damages filed against citizens. We don't have that. It talks about acts in furtherance of the constitutional right to petition for speech, association, et cetera. My view, and I think the proper view of the statute should be that when a plaintiff comes into court as the aggressor, that plaintiff is subject to the sanctions and remedies that are available under the rules of the Court of Civil Procedure. Well, how are they the aggressor? I mean, these are homeowners who are concerned about the devastating consequences to their property. Why is that not a legitimate concern? I don't dispute that it's a legitimate concern, but what I dispute is when you choose to sue, you make yourself subject to Rule 137, Rule 219, and the Court of Civil Procedure section that says damages shall be issued if an injunction is dissolved. And it's shall, as we know. It's not might or could. The difference between 137 and the Code of Civil Procedure is the shall versus the discretion. The only point I'm trying to make is it's a matter of interpreting the specific language of Section 15 of that statute. I do not believe that the Court can or should issue a ruling that provides that Rule 137, 219, or the Code of Civil Procedure on dissolving injunctions is somehow protected activity. I don't think that's good policy for the state, and I don't think that's the way that that statute should be interpreted. Thank you. Good afternoon, Your Honors. Good afternoon. May it please the Court. My name is Brett Lagner. I'm Assistant Illinois Treaty General, and I represent the Illinois Department of Agriculture in this case. Your Honors, this Court should affirm the circuit court's dismissal of the claims against the Department of Agriculture on two grounds. First, plaintiffs forfeited the claims when they amended their complaint, the first amendment complaint, and omitted or removed the Department of Agriculture as a defendant and removed all claims in reference to those claims against the Department of Agriculture. And second, the plaintiffs do not have standing to seek administrative review of the Department's permitting decision because they were not parties of that APA administrative action. Your Honors, turning to my first point, Holmes amended their complaint, filed a first amendment complaint, against one defendant only, A.J. Voss. Holmes stated two claims in that case, both for nuisance. They did not replead their, at that point, dismissed claims for declaratory judgment against their partner. Under the well-subtle precedent of this state, including the Supreme Court's Foxcroft decision, the failure to replead dismissed claims in a subsequent complaint waives those claims. Those claims are no longer part of the case. Here, the plaintiffs entirely removed the Department from this case. What about the final pleading? Was the Department in the final pleading? The Department, Your Honor, yes. In the second amendment complaint, the Department was added back in. So why is that not, why isn't that carried today? Because under the Foxcroft ruling, once the Department had, under the Foxcroft line of cases, the Department has a right to rely on the finality that is given when a complaint is amended and the claims against it are dropped. Well, the Foxcroft rationale is that the court stated, while the defendant would be disadvantaged if a plaintiff were allowed to proceed to trial on different issues and different complaints, and that's the genesis of the rule, that's understandable. The court also held there was no undue burden in requiring a party to incorporate into its final pleading all allegations which it desires to preserve. So didn't they do that? They did do that, Your Honor, but the same issue was not in Foxcroft that's raised here. In fact, none of the published cases involve an issue where there was an interim complaint that didn't replete the actions. I understand, but they ended up getting it right in the final complaint. They at least raised the declaratory judgment claims, not the cert claim, which, you know, the Illinois Supreme Court has said if you're going to seek common law administrative review, you have to do so by certiorari claim. Declaratory judgment is not proper. Wasn't the original issue raised by a motion? Yes, the request for certiorari was raised by a motion. It was never part of a complaint at all. That's correct, Your Honor. And the motion was denied at that time. That's correct. And because the issue was raised in the final pleading, I think it was a second amended complaint, and in view of the fact that the issue of certiorari was raised by a motion, a motion to dismiss from the standpoint of the state, isn't it logical to assume that a writ of certiorari would exist based on the final complaint, the second amended complaint? A claim for a writ of certiorari, Your Honor? I'm sorry. That certiorari would apply to give them a right of review. I think that had they not forfeited it, it is, you know, possibly, again, it's not well pleaded in the sense that they don't ask for certiorari in their second amended complaint. They seek a declaration. And declaratory judgment is different than common law certiorari in a number of ways. My question is, was it really forfeited when it was raised by a motion to dismiss, and the motion was denied, there was no particular judgment entered, and then the issue was raised again in the second amended complaint?  The issue for cert was raised by plaintiff in their motion for certiorari, which was denied. It was never part of a well pleaded complaint. And that's part of, that's been another consistent part of the department's argument all through that is they never adequately preserved a certiorari. And the court denied that. Correct. And it was a pending motion throughout the amendment of the complaints until you got to the final complaint. I don't believe that's the case, Your Honor. I think that that claim went away. I think that claim certainly went away when they no longer sought relief at the point when they no longer sought relief from the department, even if it wasn't independently denied before that. But I think that the denial of that was at least implied when they dismissed the claims against the department back on January 19th when the court said you cannot get administrative review of a department decision. That certainly resolves their cert claim because that's exactly what cert is. It denies it on the merit. You spent all of your time on that. You said you had a second point that you wanted to make related to this issue? Yes, Your Honor. My second point is that Holmes did not have standing to essentially collaterally attack the final administrative decision. Because they were not parties of record? Because they were not parties of record.  Nothing in the act provides for them to be parties. They are not given any required, they are not required to receive notice of any final administrative decisions that's reserved for the permanent applicant and the county board. At the same time, Holmes is allowed to come and present, ask questions at the informational hearing, but also present oral and written testimony to be considered in making the decision. So the act, the Livestock Act, clearly contemplates some involvement, but it also understands the nature or limit of that involvement and doesn't extend party of record status. What about the Holman and Greer case? Plaintiff's just cited Greer in support of the proposition of standing. What's your reaction to that argument? Greer's standing discussion dealt with general issues of, general standing issues. It did not analyze standing within the strict context of administrative action. Yes, it then, after standing, went on to look at the revealability of an administrative agency's action. But again, that court didn't purport to overrule what is the repeated and very succinct rule, starting at least back from the 1979 Supreme Court case of Williams, when the court said only a person who was a party before an administrative agency in administrative action can seek review of that action. Greer didn't involve an administrative action as such a quasi-adjudicative administrative action. You're saying Greer did not modify the longstanding rules about standing? That's correct. And the Kemp-Golden case reiterated that, the Fourth District's case, saying that you have to be a party before the administrative agency, keeping in mind the limited nature of administrative review and this court's limited jurisdiction to review such actions. Other than the standing issue in the pleading, were there other issues you wanted to address this afternoon? That covers it, Your Honor. Thank you very much. All right. Thank you. Chief Butler? Back to site-specific data, as I recall, they only drilled three holes within the perimeter of the manure ponds. I believe the tubes were three inches in diameter. And they had floods from various fillings? All the tubes in various places. Most of them encountered highly weathered limestone at relatively shallow depths, which is an aquifer material. The entire site is underlain with aquifer material. We've alleged all of these statutory and regulatory violations that have not been complied with. Karst is a regional concept. It's not a site-specific concept. If there's karst, therefore, you must comply with the building code. If you're going to build a building in the city, here's the code. If you're going to build a livestock facility in the karst region, here's the code. You made that argument before the trial court, correct? Yes, sir. And the trial court's response was what? Just that one paragraph sentence in the ruling. The weight and quality of the experts. There's no findings with respect to any of the statutory or regulatory provisions whatsoever. They should be considered. The plaintiffs have the right to assert them. Map number eight, Plaintiffs' Exhibit 33, is the foundation for that. They've acknowledged it. It shows all of the county, all of Joe Davis County is in a karst region. Therefore, they have to build it to karst standards. The Department of Agriculture is not prejudiced or surprised in any way by having to come here and defend this appeal. Didn't the appellee refer to another photograph? In my memory, it was Exhibit 7, which specifically showed no karst on the farm site. I'm not familiar with that Exhibit 7. They had another map that they printed off the Internet site of a space flight center somewhere, but it's not the proper map to use to start. I don't know where that map came from. I'm just pointing out there was evidence of another map that showed no karst on the farm site. I don't believe there's any map that shows no karst. Karst is a concept. You can't just say, well, this tube doesn't show the hairline crack that is characteristic of a karst region. It exists over a vast area. You can have your picture taken against that wall, and one little crack is all it takes. But for them to say that, well, we put a nail hole in the wall and didn't find any karst. But the whole wall is karst. So it's fundamentally flawed from the beginning. Aren't there small farms all over Joe Davies County that have cows, from a couple of cows up to 100 cows? And some of the plaintiffs in the lawsuit had farms with cows. Absolutely. But here, we're not talking about a few cows. We're talking about a city of cows. If we were a city of people, we'd have a waste containment facility. And isn't the primary problem of waste containment systems? It's sanitation. Fundamental human sanitation. And didn't the court make a specific finding that the proof regarding the construction of the ponds, the containment ponds, would satisfy the statute and would not cause any contamination? There's no finding at all with regard to that. In essence, that was the testimony of the experts. And the issue was the safety of the ponds. He didn't say that these ponds are safe. There's no specific finding whatsoever that these ponds are safe. To the contrary, they will permit contamination of groundwater, which is by definition a public nuisance. Put it another way, that was one of the prime issues in the case, the safety of the containment ponds. Yes, sir. And the court found in favor of Boss with respect to that issue. And there was testimony in regard to all of the safety precautions. As if these statutes don't exist, it gives them a free pass, like we've argued in the brief. This is a zoning case. The neighbors have standing to complain to what the guy's going to do next door. And it's a trespass case. It discharges silage leachate right across the street on Mr. Olsen. That's a trespass. It's a Chicago flood case. It's a substantial invasion. It has occurred. It is occurring. It will continue to occur. Nothing will stop it from occurring. Plaintiffs and the public implore this court to render a decision that safeguards our constitutional right to a healthful environment. That's the crux of this case. And we trust that this honorable court will do its best to honor that constitutional provision. Thank you. Is there any other evidence? Argument? No. All right. The case is taken under advisement, and the court stands adjourned.